Good afternoon. Our first case today is A.A. v. Attorney General of the United States, number 17-1176. You may begin. Good afternoon, Your Honors, and may it please the Court. My name is Anne Wynn Hughes, and I represent the petitioner in this case, A.A., and with the Court's permission, I'd like to reserve five minutes for rebuttal. That will be granted. Thank you. I'd assume in this case is whether a refugee from Syria to whom the immigration judge and the Board of Immigration Appeals would otherwise have granted asylum is barred from all forms of refugee protection as a terrorist because he performed mandatory military service in the national forces of his country's government. In this case, he did this under duress and also in an entirely nonviolent capacity. We're well familiar with the facts. Can you go straight to the textual argument that the government presses, which is, look, there's just nothing in the statute that gives you an out. I take that to be, not to put too fine a point on it, but this is very broadly worded. It was broadly worded intentionally. It doesn't say anything that would even suggest that state actors are exempted. So how do you deal with the breadth of the text? We don't dispute that 1182A3B is a collection of very broadly worded definitions. That's true of the Tier 3 definition. It's also true of the definition of terrorist activity itself. But if you read the Tier 3 definition in the literalist way that the government is urging here, it removes these provisions from their statutory context, and it also makes other provisions of the statute redundant. Well, that's okay. You're getting where I'm hoping you'll go. What is it that makes you say it's atextual, that is, it removes it from context and therefore makes it make not sense in the context of the statute as a whole? Well, the statute as a whole is aimed at the suppression of terrorist activity. And by the time the – and from – I should also say that from 2001 until the date of the immigration judge's decision, in this case in 2016, to our knowledge, the Tier 3 definition and indeed the Tier 1 definition had only been applied to state actors. So to the extent the argument is one around plain language. No longer true, though, right? Well, it's no longer true, but at the same time, we're all reasonable people and we don't agree about much else and we've all been reading it this way for some 16 years. Well, I'm not just talking about in this case. There's the Revolutionary Guard decision, right? Isn't that – I mean, you're pointing to sort of custom and practice. If you're going to do that, then how do you deal with it when the State Department does say, okay, here's an arm of the state and it is a terrorist organization, Tier 1? Well, the – I think several things. One, you know, for example, if a legislature were to pass a statute for the regulation of child care providers, for example, and it defined a child care provider as any person or group of persons, whether or not incorporated, that provide care to children on a regular basis. And it included some kind of a strict liability provision that said that if a child suffers injury in your care more than once in a year, you lose the right to care for children in perpetuity. We would not read that to apply to parents. Let me ask you this. Is there a difference between the State Department or the executive designating a group as a Tier 3 terrorist organization and an individual IJ? Yes, there is. And I think the other thing that makes the application of the Tier 3 definition in particular difficult to apply to state groups is that the Tier 3 definition is the loosest of a hierarchy of three types of definitions in the Act. And they are defined in a hierarchy of strictness of terminology and also a hierarchy of strictness of process. So the Tier 1 definition, which is the one that was applied to the IRCG just recently, is the strictest on both according to both parameters. So it has a pretty precise definition. It requires that the group pose a threat to U.S. interests and U.S. persons. And there is relative transparency in the designation process. So there is publication in the Federal Register. There is prior notice to Congress. There's an opportunity for affected groups to seek review and so on. The terrorist exclusion list, a.k.a. Tier 2, similarly requires publication. And if a person is inclined to give to such a group and wants to know how the United States considers it, the person can look it up. And I think that in this connection, although I certainly acknowledge the breadth of the wording of the Tier 3 definition as a group of two or more individuals, whether organized or not, that strikes us as an unnatural way to refer to the organized military forces of a foreign state. And it also seems unlikely. We're not the first ones to deal with this, right? There's other cases that have addressed this. What do you do with the language of the D.C. District Court where I think the case was, I'm sure I'm going to not do justice, Udugampola? Udugampola would be my guess, Your Honor. That one? That one. I apologize to Mr. Udugampola, wherever he is, for slaughtering his name. But that court said, by its plain terms, the statute provides no exception for those acting in their capacity as officials or officers of foreign nations. And that's, you know, that's going back to this same idea that even if it strikes you as unnatural, the language covers it. Does it not? Well, if Congress had understood it to cover it, then it's hard to see why Congress would have passed two other provisions that specifically cover conduct that would otherwise be included within the scope of 212A3B. Timing. What's the timing of those? In light of the Real ID Act, right? Because we're talking about a statute that gets put in place and it's amended by the Patriot Act and it's amended by the Real ID Act. So the Tier 3 definition in its original form came into the Act in 2001 with the Real ID Act. I'm sorry. I'm getting this wrong. With the USA Patriot Act. Forgive me. And it was then amended by the Real ID Act in 2005. In 2004, the Congress incorporated into the Act the provisions in the Intelligence Reform and Terrorism Prevention Act of 2004, which was the provision that makes inadmissible anybody who under collar of law of a foreign nation. So here's my question to you. If you can see that Congress is still amending and changing and polishing this thing after the more specific provisions you're relying on, doesn't that indicate that Congress knows it's dealing with a broadly worded thing here and it's not attempting to narrow it down? I think that Congress was attempting to expand in 2004 and then again in 2008 with a similar provision with respect to child soldiers. Expanding the scope, right? It's expanding the scope of the inadmissibility provisions of the INA as a whole, correct. But there wouldn't have been a need to do that if Congress had understood the terrorism related inadmissibility grounds to apply to the acts of foreign government officials. Well, that brings me to one of my questions. You spent a lot of pages in your brief talking about this revision history that Judge Jordan was talking about. You point out rightfully that reference to government was dropped out. But wasn't the basis for inadmissibility actually broadened as a result of all the different changes after 9-11? They certainly were. But I don't think it follows from that that they were broadened in a way that was covering the acts of foreign governments. And I would say in this connection that I think that there is a difference between – I mean there is definitely a difference between describing a state as a foreign sponsor of terrorist activity and to say that a state or its agencies are terrorist organizations in a direct sense. And I completely agree with the government that Congress has made references and has laws penalizing states that are described as sponsors of terrorism. But that is one remove. And in fact, using terminology like state sponsors of terrorism is in a way a way of avoiding describing the state as a whole as a terrorist organization. There's no question that – How do you deal with the designation of the Revolutionary Guard as a terrorist organization? Well, the designation – I think that you can conceive that Congress might have allowed the State Department to apply the terrorist organization – the Tier 1 terrorist organization. So you're saying Congress, without saying anything about it to make the distinction, was meaning to let the State Department and Homeland Security and the Attorney General do designations, but they never meant for the INA through immigration judges to be able to take the same act at Tier 3. Is that your argument? Correct. But assuming arguendo that the Tier 1 designation of the IRCG was within the State Department's delegated powers, I don't think it follows that Tier 3 – There's no text to support that, right? There's no text that you can point to in the statute that makes the distinction you're making there. Is there? I think that, you know, I'm looking at these provisions as they fit within a coherent scheme, where Congress was clearly intending for there to be a fairly well – I see I'm out of time. No, go ahead. A fairly well-regulated and coherent process for designating even what up until that point have been non-state groups as terrorist organizations. And so I don't see how Congress would delegate something this important. Let me ask – my colleagues will indulge me with one more question. Sure. You're talking about this scheme as a whole. At the same time they were giving – adding these tiers and giving broad statements about what would be covered, did they not also make provision – Congress make provision for exemptions and then expand those provisions for exemptions even as they increase the – apparently increase the reach that immigration judges might have for designating terrorist organizations? Well, at the same time that they were expanding the scope of the terrorist and immiscibility provisions, Congress also delinked the provision of material support from the provision of material support from the furthering of any specific – Perhaps, but stick with me on my question. They did that, what I said, right? They gave increased exemptions. They allowed for group exemptions, not just individual exemptions. They expanded who could provide those exemptions, right? It wouldn't just be the AG. It would be Secretary of State or Department of Homeland Security. They had to consult with each other. But there was – as Congress was doing this, that is, giving this real broad authority to designate terrorist organizations, it was also broadening exemption capacity, wasn't it? It was broadening it in certain ways and also it straightened it in certain particular ways as well at the same time. Doesn't that indicate that as a comprehensive scheme Congress understood, okay, we're hitting this with the – you can – everybody could look at this and have a different idea and say it's a sledgehammer to go after a smaller problem than it needed, but they decided what they decided. And at the same time, as part of that scheme, they put the safety valves in place. Doesn't that support what the government is saying, is that this is meant to be broad because there were exemptions provided? I think to say that it's meant to be broad is not the same thing as to say that Congress meant it to be infinitely broad. There is plenty of over breadth or of breadth, depending on your perspective, in this statute, quite aside from the acts of state actors. And there are numerous reasons why the United States wants to and needs to let people into the country who might fall under some of the undisputed scope of the tariffs of 1182A3B. I don't – it doesn't follow from that that Congress at any point was envisioning that this would be applied to state actors. And, in fact, if one does read the statute that way, it's a little hard to read that consistently with the board's own precedence in SK, for example, which took the position that a non-state group can be deemed to be a tier three terrorist group solely by virtue of the fact that it takes up arms against an established government. But if that established government is also treated as a terrorist organization under the Act, Your Honor, I don't quite see how or by what legal authority that state force and the government that funds it, supports it, and controls it has the legal authority, which the U.S. in general acknowledges, to suppress armed rebellion against it. Thank you. Thank you, Your Honor. Good afternoon. May it please the Court. My name is Paul Stone. I represent the Respondent, Attorney General of the United States. Petitioner is seeking asylum withholding or removal. He's not seeking cap protection because he already has that. And you're not – this isn't about that? No. The issue before the Court is a narrow one. The issue before the Court is whether the Syrian militia Jais al-Shaabi is a group for purposes of the tier three or undesignated terrorist organization statute. Well, is the issue before us also whether the IJ has the authority to designate these folks as tier three terrorist organizations? While they're not designated, it's making a finding that they are undesignated terrorist organizations. That's one of the arguments is that it's an improper delegation of authority to the immigration judge. But as the Board said in SK, it doesn't have the authority to recognize the legitimacy of the foreign government. That's not what's happening here. The immigration judge is not making a finding that a militia controlled by a foreign state is illegitimate or somehow isn't a militia or isn't controlled by the foreign state. It's simply finding that that militia engages in terrorist activities and its members may be barred. It's not delegitimizing it. Well, nonetheless, that's really sweeping authority, isn't it? Is it too much authority for individual IJs all over the place to be making those kinds of decisions? Well, Your Honor, the trig grounds, the terrorism-related inadmissibility grounds are sweeping. They are extremely broad. This Court was one of the first that recognized that in the McAllister case where it pointed out that these bars not only sweep up what we think of as terrorist activities, but what we might not and Congress might not even think of as terrorist activities. And that's where the exemption. Well, that's pretty significant, isn't it? I mean, if even Congress didn't anticipate this effect, shouldn't that tell us that you're reading it too broadly? It might, but in this case, Congress realized that, and that's why it created the exemptions. Rather than narrowing the language, which Congress could have done, it enacted these exemptions and gave the discretion to the executive to determine when the statute is overbroad and to fix that. And it passed the first set of exemptions in 2005. Those weren't broad enough. It passed the second set in 2008, expanding them, especially in the case of Tier 3 organizations, where it permitted exemption of an organization entirely from being treated as an undesignated terrorist organization with certain narrow exemptions. Here's what I understand Mizzou's argument to be, that Congress couldn't have meant this to be the case, because if it's given the application that the government now says it should have, you have ordinary citizens who do nothing more than pay their taxes in a foreign country who, because some immigration judge somewhere in the United States of America decides that some organization affiliated with that country is a Tier 3 UTO. Now, everybody in the country, everybody in the country is affiliated with a terrorist organization because the statutory scheme means, because that organization identified by the immigration judge is a terrorist organization. Per that, IJ, sitting by him or herself, is a subgroup of the larger state organization. The entire state is a terrorist organization, and anybody who supports the state is by definition barred as a material supporter of a terrorist organization. So Bob Jones, someplace in another country, just paying his ordinary everyday taxes becomes inadmissible in the United States as a party to material support of a terrorist organization. Now, what is wrong with the logic of that argument from Ms. Hughes, that that is the result, that's the logical end to which the government's argument here drives us? That requires a lot of suppositions and jumps in following that trail. The first of which is this court's decision in Uden, which requires authorization. So we're assuming that there's authorization all up and down. It's not just a rogue unit of the military. We're also assuming that none of those groups fall under the Tier 3 exemption. This exemption specifically that the subterranean state... Assume all of that. It's still, as soon as one IJ, you know, sitting, I don't know, in York, Pennsylvania, or in the Yukon, someplace one person says that organization, I think that's a terrorist, I think that's a UTO. Then everybody in that country is now inadmissible. That's what they're telling us on the other side. And you follow their logic, it seems pretty compelling. Isn't that, in fact, where you end up? It's also not correct for another reason, which is that immigration judge's decision isn't binding on the entire country. It's not binding on the next alien who comes forward with different evidence. It's not binding on the board of the attorney general who can review that case. So by this designation, if the IJs have that authority, then you're going to have really inconsistent results everywhere. Well, that's where the Board of Immigration Appeals comes in, and ultimately this court, as it did in Uden, where it harmonized the decisions to ensure a more stable decision-making. And that's also why the exemption, Congress gave exemption authority to the Secretary of Homeland Security, where they're adjudicating these things in-house and looking at each organization and determining whether or not they're subject to the exemption. So ultimately, yes, this is very broad, but the terrorism and admissibility grounds are very broad and admittedly do sweep up people that we otherwise might not think of as terrorists. And not only very broad, but, as you said, unprecedented. Nobody's ever done this before, to a civilian refugee or a refugee from anyplace else in the country. Is that an accurate statement? We're looking at the first of its kind here. Well, if by this, Your Honor, you mean an alien being admissible under a terrorism ground for participating in a militia, a sovereign-controlled militia as a terrorist organization, yes. Many aliens have been barred from admissibility for other conduct with foreign militaries or foreign government organizations. As she points out, you know, in things like the persecutor bar, well, that's not an admissibility ground, but the extrajudicial killing bar, the genocide bar, and barred from eligibility for relief from things like the persecutor bar. So it's not uncommon at all that people are precluded from admission or benefits, immigration benefits, because of conduct that they engage in with the government. One case I cite, the Budis-Casanova case, was a general, I believe it was in El Salvador during the wars in the 1980s, was removed for having assisted in the extrajudicial killing. The guy was conscripted, though. Yeah, he's drafted and he's a draft resister. He's doing everything he can not to be part of this militia, and yet the government has decided to tag him as a material supporter of terrorism. Well, and Your Honor, he also was eligible, not just eligible for Tier 3 exemption, but eligible for individual exemptions on those grounds, for example, the duress exemption. He was considered for that here. He didn't receive one, but he hasn't challenged it in front of this court, so it's not in front of the court. But these folks are not just eligible for the group exemption. They're eligible for individual exemptions as well. So there's much more to this than just the immigration bar, the trade bars themselves.  I'm sorry? No, he was considered for it. See, I has considered him for it. He has denied exemption, but he didn't challenge it in this court. So it's not at issue here today. But he was eligible to be considered for such an exemption. And anyone who is subject to this bar can be considered for exemptions. That's why Congress, rather than narrowing its extremely broad language, instituted the exemption provision. Anything more, Counsel? Your Honor, I don't have anything else unless you have any questions for me. Okay, thank you, Counsel. Thank you. I just wanted to make a few points in closing. One is that I think that this case illustrates unusually well the problem of inconsistent decision-making and over-delegation of authority or an expansive understanding of the authority that's been delegated. Well, speak to Mr. Stone's point that that's what we've got the BIA for and that's what we've got judicial review for. Well, I think that as far as the BIA is concerned, I think that this case illustrates that problem there as well. I mean, here we have an immigration judge who decides to hold that a particular army meets the Tier 3 definition, despite the fact that neither side was arguing that. And then the board review consists of a single-member affirmance, even though it was a case of, you know, first impression of potentially national importance. And now here we are. And I realize that neither the IJ's decision nor the unpublished decisions of the BIA bind anybody, but this Court's decision, while not determinative perhaps of other cases argued on other facts with respect to the same group, nonetheless has public force in a way that the administrative decisions were not. I would also say that there's a huge difference between the persecutor bar and the extrajudicial killing bars and the other grounds of inadmissibility that would apply to General Vidas Casanova, for example, and to others, which is that those bars target people for criminal wrongdoing and human rights violations over which they themselves bear personal responsibility, which is not the case here. I mean, the stunning thing about my client's situation is that he did nothing illegal. That is to say, the illegal thing he did was fleeing for military service, not performing it. What he did, while forcibly conscripted, was a violation neither of Syrian law, nor would it be a violation of U.S. law while he was here. Well, that may be a problem for your friend as an individual, but is that a legal basis for saying Congress didn't mean what it said? I believe so, Your Honor, because Congress enacted legislation in fulfillment of U.S. obligations to protect refugees under the 1967 Refugee Protocol, and it's never receded from those obligations by statute. Maybe we could do this. Yes. Would you concede that the language as it exists, looking at the provision, and you might say, oh, in isolation, but looking at the provision, you read it, and it does not make any exception at all for state actors. It just covers anybody who supports terrorist activity, right? And terrorist activity is very broadly defined. I would certainly concede that it makes no explicit exception for state actors. So the only way to get to your position is to say, as you have, well, look at the Child Soldiers Act, or look at this other one legislative piece where they make a specific statement about state actors. That shows it couldn't have been meant to be that broad. Have I got that right? You require us to look at those other two places and say, ergo, it couldn't have meant that, right? I would also say that the – sorry, I lost my train of thought. I would also say that this needs to be interpreted consistently with the Refugee Convention as well, and this Court has held – has interpreted the National Security Bar, which is the one that the TRIG Bars incorporate by reference, in a way consistent with the Convention's understanding that it should be premised on actual, serious criminal misconduct, of which there's none here. Also, statutorily, the definition – You're almost out of time, so let me ask you a question as to your client specifically. Well, two things. First, is Mr. Stone correct that he had an opportunity to make a duress claim, that is, to push for a duress exemption, and he didn't push for that up through preserving it and arguing it here. Is that right? That's not quite correct, Your Honor. He was considered for a duress exemption. As this Court knows, this case was held in abeyance for a very long time while the agency decided what it wanted to do in that regard, and then he was ultimately denied. The difficulty, as you know, is that the judicial review that's allowed for those types of decisions is exceedingly narrow, and so in a situation where the denial is premised on a constitutional failing or an error of law, then I might come before you and argue about that. But in a situation where the agency simply decides it doesn't want to do it, this wasn't an abdication on our part. So what you're saying is that the duress exemption is solely within the discretion of the executive branch, and so it was purposeless for you to raise it? Correct. Okay. So the exemption that Mr. Stone is advancing is don't worry about it and there's judicial review available to save these kinds of things. You're saying that's illusory because the duress exemption is effectively unreviewable. I mean, except in the very narrow situations for which the statute would allow review. Correct. All right. Can I just follow up on that a little bit? Is this one of those discretionary things that is just not reviewable, or would you be able to review it if there was a misapplication of law or something? There is review available for errors of law and constitutional claims. Right. And this would be one of them, right, the duress exemption? If an IJ blew it in terms of the law? But the IJs are not. Oh, right. This is the difficulty, that it comes in after the fact. Right, yeah. And I would also – I'm out of time. Go ahead. The BIA would look at it. It would be reviewable if the BIA said this is not covered by the duress exemption and we thought you just misread the law. We could review that. Well, actually, neither the IJ nor the BIA makes determinations explicitly as to the applicability of the exemptions. What they are supposed to do, according to the DHS's exemption process, is ideally make findings as to whether or not the person would be eligible for the relief he seeks but for the inapplicable terrorism-related inadmissibility ground. At that point, it goes to the agency, in this case USCIS, to determine whether or not they wish to give the person an exemption. And if they don't, is there no review? Is there not an administrative mechanism to say, wait, you just got that wrong. You did not just, as a matter of fact and discretion, you've misunderstood the scope of your own authority. You've misunderstood the power that you've got to give this exemption. There's no way to get that reviewed as a legal matter? I don't see it. Okay. Well, wouldn't that be curious? Okay. Thank you for enlightening us on that. That's something we don't know much about. At least I don't know much about it. It's also a remarkable fact that a high proportion of reported cases involving interpretation of the terrorism-related inadmissibility grounds from this court and others have involved people who, for whatever reason, were not given one of these exemptions. Your client has got cat protection now. He has cat deferral, yes. But he was 19 when he was conscripted into the military. He's only in his 20s now, and most of us at that stage in our lives would like to envision a future that's defined in less negative terms than an absence of torture. Thank you, counsel. Thank you very much. We'd like to thank counsel for their excellent briefing and argument here. Really, it was terrific. We'd like to ask the counsel to order a transcript of this argument, and if you could split the cost, that would be great. You can deal with the clerk after argument. We also wanted to, again, thank you for coming. And if you're amenable, we'd like to thank you at sidebar in a more personal way.